B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Bay Point Capital Partners II, LP | DEFENDANTS<br><br>InterBank and Real Estate Holdings, LLC |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Vartabedian Katz Hester & Haynes<br>LLP 2200 Ross Ave., Ste. 4200W<br>Dallas, TX 75201<br>Tel: (817) 214-4990 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Ste. 4000<br>Dallas, TX 75201<br>Tel: (214) 855-7500 |
| PARTY (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>X Creditor □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>X Creditor □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Declaratory judgment action, violation of Texas Fraudulent Lien Statute, breach of contract, negligent misrepresentation, fraudulent inducement, and equitable subordination under Bankruptcy Code 510(c)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
- X 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| X Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Ennis I-45 11 Acre LLC | BANKRUPTCY CASE NO.<br>25-31219-mvl11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Judge Larson |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Jeff P. Prostok | | |
| DATE<br>03/22/2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Jeff P. Prostok | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Jeff P. Prostok
State Bar No. 16352500
Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: (817) 214-4990
Fax: (817) 214-4988
jeff.prostok@vkhh.com
emily.chou@vkhh.com
blake.glatstein@vkhh.com

*COUNSEL FOR SECURED CREDITOR*
*BAY POINT CAPITAL PARTNERS II, LP*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 25-31249-mvl11 |
| ENNIS I-45 11 ACRE, LLC, | § | |
| | § | |
| Debtor. | § | (Chapter 11) |
| | § | |
| | § | |
| BAY POINT CAPITAL PARTNERS II, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adversary No. 25-03063 |
| | § | |
| INTERBANK and REAL ESTATE HOLDINGS, LLC, | § | |
| | § | |
| Defendants. | § | |

## SECOND AMENDED COMPLAINT

1

Bay Point Capital Partners II, LP ("Bay Point"), as secured creditor, files this Second Amended Complaint in the above-styled adversary proceeding ("Adversary Proceeding") against Defendants InterBank ("IB") and Real Estate Holdings, LLC ("REH," and collectively, "InterBank") seeking (1) a declaratory judgment that Bay Point is the first lienholder of Debtor's Property, as later defined, because InterBank recorded an unrecordable deed of trust, (2) seeking damages for violation of the Texas Fraudulent Lien Statute, and (3) asserting claims and seeking damages for (i) breach of contract, (ii) negligent misrepresentation, (iii) fraudulent inducement, (iv) fraud, and (v) equitable subordination.

## I.    Parties

1.    The parties to this Adversary Proceeding are as follows:

a.    Bay Point is a secured creditor of Debtor Ennis I-45 11 Acre, LLC ("Debtor"), and the alleged second-priority secured creditor of Debtor's single-asset real estate holding ("Property") in the above-referenced bankruptcy case ("Bankruptcy Case").

b.    Debtor operates a luxury RV park at 509 South lnterstate 45, Ennis, Texas 75119 (the "RV Park").

c.    IB is a federally insured bank under the FDIC and chartered under the laws of the State of Oklahoma. Pursuant to § 17.028 of the Tex. Civ. Prac. & Rem. Code, IB may be served by serving its registered agent or by serving the president or the branch manager at any office.

d.    REH is an Oklahoma series limited liability company acting for the benefit of its Series C and is the alleged first-priority secured creditor of the Property. REH is a wholly owned subsidiary of InterBank. REH is not a registered filing entity with the State of Texas and thus failed to maintain a registered agent. REH also transacts business in Texas without being

registered as required by Chapter 9 of the Texas Business Organizations Code. Thus, under Tex. Bus. Orgs. Code §§ 5.251 and 5.252, REH may be served through the Secretary of State of Texas.

## II.   Jurisdiction

2.   The Court has jurisdiction over this Bankruptcy Case and this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This Adversary Proceeding is a statutory "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(B), (G), (K), and (O). This Court has constitutional core jurisdiction to enter a final judgment in this Adversary Proceeding. Bay Point consents to the entry of a final judgment by the Court in this Adversary Proceeding.

## III.   Introduction

3.   According to InterBank, Gage Roland ("Roland"), its long-term loan officer, created a $7 million "mess" that had to be "cleaned up."  Jeff Frazier ("Frazier"), Roland's father-in-law and InterBank's Executive Vice President, and Melissa Tucker, Esq., InterBank's outside counsel that also drafted the original unapproved loan documents and the Interceditor Agreement central to this Adversary Proceeding, together, were tasked with performing the "clean up."

4.   The "mess" started with Roland originating and causing InterBank to fund an █████████████████████████████████████ to create an unrecordable deed of trust and lien void to creditors under Texas law. When Roland ███████████ closed the $7 million loan to Debtor on July 18, 2022, Roland ████████████████████████████████████████ ███████

█   ████████████████████████████████████████████████
████████████████████

█   ████████████████████████████████████████████████
████████████████████████████████

3

- ██████████████████████████████████████
  ██████████████████

██ ████████████████████████████████████

██ ██████████████████████████████████████
  ████████████████████████

██ ████████████████████████████████

██ ████████████████████████████████████████
  ██████████████████████████

██ ██████████████████████████

██████████████████████████████



Smith 30(b)(6) and Reb. Expert Dep. 5:7–23.

5.      ██████████████ Melissa Tucker's and Frazier's combined cleanup started

with a series of InterBank's actions and inactions aimed to hide its void lien from Bay Point and

further to fraudulently induce Bay Point to make a $4 million loan to Debtor that would serve only to improve the value of InterBank's underwater collateral. The cleanup continued through improper handling of condemnation proceeds, efforts to have Bay Point purchase InterBank's debt at full par despite InterBank knowing the RV Park's value was significantly less, and efforts to have Debtor's bankruptcy case dismissed so that InterBank would not have to answer for its wrongdoings.

6.    And the cleanup ends here in this Adversary Proceeding with outlandish discovery abuses and testimony to continue to spread the false narrative that it handled Debtor's $7 million loan conservatively.

7.    But along the way, Melissa Tucker was instrumental in InterBank's conduct related to Debtor's InterBank loan and Bay Point's agreement to fund a mezzanine loan. First, InterBank engaged Melissa Tucker, through her firm the Law Office of Melissa M. Tucker, PLLC, to prepare the loan documents that were never approved. When Melissa Tucker went unpaid for her work, Melissa Tucker alerted InterBank that its payment was a few months delinquent.  This was InterBank's first notice of ███████████████████████ :



5

Underwood 30(b)(6) and Reb. Expert Dep. 69:8–24 ███████████████████████

██████. InterBank again retained Melissa Tucker, but this time to investigate the loan closing

████████████████████████████████████. Melissa Tucker's investigation uncovered facts

disturbing enough to cause InterBank to ███████████████. During its investigation, InterBank and

Melissa Tucker learned, inter alia, that a $7 million loan was ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

Underwood 30(b)(6) and Reb. Expert Dep. 106:6–14. Shortly thereafter, Roland caused InterBank

to disburse over $3 million using paper withdrawal slips and cashier's checks executed at a counter

transaction. InterBank's records do not reflect these transactions for at least six weeks after they

occurred. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████.

8.      Terry Smith ("Smith"), Lee's direct report and another Executive Vice President of

InterBank, along with the General Counsel Deanna Tillotson ("Tillotson"), setup and managed the

cleanup. Both Smith and Tillotson reassigned Debtor's $7 million loan to Frazier, Roland's father-

in-law, to "clean[] up ███████████." That "clean up" included—once again—hiring Melissa Tucker to do the "heavy lifting." InterBank apparently no longer recalls what Melissa Tucker did to "clean up" the loan, except that she was only able to do it "the best she could" and thus all of the issues were never fully resolved.

████████████████████████████████████████████████████

Oct. 8, 2024 Memo Emailed From Frazier to Smith.[1] Frazier also only recalls cleaning up "some technical issues with spelling of the names on the borrowers" but "can't remember exactly" since Melissa Tucker and Tillotson "look[ed] into the documents and made sure everything was right" and "Melissa Tucker did all the heavy lifting."

9.     But InterBank only remembers two troubling issues that only beg more questions:

(1)     the unrecordable July 18, 2022, deed of trust (the "<u>Deed of Trust</u>") was recorded on December 8, 2022, after a few months of cleaning up, and

(2)     InterBank received title insurance on its $7 million in February 2023, a few months after the fraudulent Deed of Trust was recorded.

Melissa Tucker and InterBank undoubtedly knew that the Deed of Trust was void because it was improperly notarized—facts that Melissa Tucker and InterBank learned during the investigation into ████████████████████████████. But InterBank and Melissa Tucker working together to record a fraudulent lien and dupe a title insurer did not stop the "cleaning up" – unfortunately, it continued from there.

---

[1] Interestingly, Deana Tillotson was InterBank's General Counsel during most of the relevant time and engaged Melissa Tucker of the Law Office of Melissa M. Tucker, PLLC, during most of the relevant time, to work on a myriad of issues with Debtor's loan. Now, both Tillotson and Melissa Tucker work together at the law firm Munsch Hardt Kopf & Harr, P.C.

10.     Frazier discovered that InterBank loaned $7 million to construct an RV Park that was unfinished and out of money after Debtor allegedly spent over $14 million on a project that should have cost at most $6.5 million, according to CBRE's appraisal admittedly relied on by InterBank. More importantly, by December 2022, InterBank knew its loan was far underwater and that its collateral was significantly impaired. The original land was bought for $1.1 million and was worth as-is $3.5 million, at most, according to the CBRE appraisal InterBank used. And InterBank knew that it would not lend any additional money to Debtor. Thus, InterBank needed Debtor to find a new source of capital to finish the RV Park and improve InterBank's collateral position, and InterBank was willing to assist in that process, for obvious reasons.

11.     With that knowledge, Frazier, Smith, Tillotson, and Melissa Tucker continued "cleaning up" the mess of a loan by a concerted effort with Debtor and Jones Lang LaSalle ("JLL"), a multinational and multibillion a leading global professional services firm specializing in real estate and investment management, to find and induce another lender to make a loan to Debtor with the stated goal to either satisfy InterBank's loan or shore up the value of InterBank's collateral. Bay Point was that unlucky lender.



| From: | Jeff Frazier |
| To: | Prescreen |
| Subject: | June 30 Prescreen |
| Date: | Monday, June 26, 2023 4:06:14 PM |
| Attachments: | ████████ |
| | image08a134.JPG |

For Friday's Prescreen Call:

████████████████████

████████████████████

████████████████████████████████

Ennis I-45 11A LLC – $7,000,000 loan for the construction of a luxury RV park in Ennis, Tx on I-45. Park is 85+% complete and we have funded $6,366,941 to date. Borrower is seeking a Mezz loan in the amount of $3,600,000 to fund cost overruns due mainly to a redesign that picked up 4 additional spaces, concrete and utility cost increases, upgrades that include awnings, and a dog park that were not in the original budget, etc. Legal is working on the intercreditor agreements. JLL has indicated they will take us out shortly after C/O. JLL appraised the property on March 16, 2023 for $21,200,000 at completion and $30,800,000 at stabilization.

12. Based on a flawed appraisal made by JLL at InterBank's request in February 2023 (which was manipulated to make it appear valid), after InterBank knew it was not providing more funding to Debtor, Bay Point believed it was funding $4 million on a project with a stabilized value of $30.8 million when InterBank knew the whole time the project's value was, at most, $11.6 million  (consistent with the CBRE appraisal InterBank relied on 13 months earlier during a period with lower interest rates and higher real property values). Bay Point thought that the construction project was on schedule and on budget, and Debtor needed more money because they expanded the scope and luxury of the originally planned RV Park. More importantly to Bay Point, InterBank is (and was at the time) an FDIC-insured bank and NMLS member subject to certain federal and state lending regulations. Thus, Bay Point became comfortable making the loan because InterBank was willing to represent and warrant that it had complied with its regulatory obligations and further expressly represented and warrantied in an Intercreditor Agreement ("ICA") that:

    a. InterBank knew of no current Events of Default or event that would constitute an Event of Default in the Senior Loan Documents, including the Construction Loan Agreement ("CLA").[2]

    b. InterBank was the legal and beneficial owners of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

    c. InterBank made its own credit analysis and decision to extend and advance the Senior Loan to Debtor based on such documents and information as it has deemed appropriate.

    d. InterBank agreed the ICA was enforceable against it in accordance with its terms subject to applicable bankruptcy laws and general principles of equity.

    e. The performance of the ICA and the consummation of the transactions contemplated by the ICA (*e.g.*, the CLA, the recording of the Deed of Trust, etc.) did not constitute a violation by InterBank of any statute, law, or regulation that is applicable to InterBank.

---

[2] "Events of Default," "Senior Loan Documents," and "Construction Loan Agreement" are terms defined in the ICA and their meanings are incorporated by reference herein.

9

13.     Unbeknownst to Bay Point, at the time InterBank executed the ICA, InterBank knew these representations and warranties were untrue and that the JLL Appraisal was "garbage."

14.     Therefore, in June 2025, Bay Point originally filed this Adversary Proceeding to seek relief from InterBank's breach of its agreements, misrepresentations, and fraudulent schemes. After learning about more egregious facts and schemes during discovery, Bay Point amends its Complaint again. Discovery has served only to make Bay Point's initial theories much more clear; InterBank had one motive: fraudulently induce others to spend money to enrich InterBank's impaired collateral to improve InterBank's likelihood having its loan repaid, all while knowing that all others would lose everything. Through this Second Amended Complaint, Bay Point seeks relief from InterBank's wrongful and fraudulent conduct.

15.     First, Bay Point seeks a declaratory judgment that Bay Point is the first lienholder of Debtor's Property because InterBank's Deed of Trust is void and does not (and could not!) create notice to Bay Point, or any third party to the Deed of Trust, of a priority lien against the Property.

16.     Second, Bay Point seeks damages and relief from Defendants for violation of the Texas Fraudulent Lien Statute and for claims of breach of contract, negligent misrepresentation, fraudulent inducement, fraud, and equitable subordination because Interbank, and those working with and on behalf of InterBank, intentionally and deceitfully induced Bay Point to fund a project that InterBank knew could never have value sufficient to protect Bay Point's second-position security interest.

17.     Third, based on the above claims, Bay Point objects to InterBank's proof of claim in the Bankruptcy Case and any relief from the Debtor's stay that InterBank seeks.

10

## IV. Factual Background

### A. The Debtor and Its Relationship with InterBank

18. Debtor is a company organized only to develop the RV Park. Debtor's principals are Bill Moist and John McGaugh.

19. Bill Moist claims to be a professional with more than 30 years of real estate experience, including prior experience developing RV parks. Terry Smith, InterBank's Executive Vice President, has known Bill Moist since the mid-1990s.

| From: | "J. Terry Smith" <Terry.Smith@interbank.com> |
|---|---|
| To: | "Gage Roland" <Gage.Roland@interbank.com> |
| | Prescreen <Prescreen@interbank.com> |
| CC: | "Jeff Frazier" <Jeff.Frazier@interbank.com> |
| | "Pam Underwood" <Pam.Underwood@interbank.com> |
| Date: | 1/21/2022 1:23:18 PM |
| Subject: | RE: Construction Request for Ennis RV Park |

Gage
\~
Where is the equity coming from?\~ Principals don't have much.\~ I know Bill.
\~
jts

J. Terry Smith
DFW Regional President

20. John McGaugh claims to be experienced with coordinating investments in real estate.

21. The Debtor purchased approximately 11 acres of land in Ennis, Texas, which was to be used to construct the RV Park. The purchase price for the property was $1.1 million, which was funded with a down payment of approximately $450,000 and a note due to the seller in the amount of approximately $650,000 (the "Seller Note"). The Seller Note was secured by a lien on the Property. Debtor contracted with Dry Built General Contractor Inc. ("Dry Built") to construct the RV Park. Dry Built is owned or managed by Terry Richie ("Richie").

22. Long before getting involved in the Debtor's Project, Richie had a relationship with InterBank and specifically with Roland, who had financed several of Richie's projects in the past.

DryBuilt General Contractor, Inc. is the General Contractor and has been in business for over 40 years. They have successfully completed construction projects in a variety of markets and disciplines. Terry Richie is the President and has been a Texas General Contractor based in Midlothian, TX.. Officer has financed projects with Terry Richie as General Contractor and has had no concerns with Terry's ability to complete the jobs efficiently and without issue.

*See* Credit Memorandum and Executive Summary to DFW and DLC Loan Committees.

### B.  InterBank's Initial Term Sheet and the CBRE Appraisal

23.     On October 29, 2021, InterBank issued a term sheet for a proposed financing of the RV Park (the "Term Sheet"). It planned for a construction loan in the original principal amount of $8 million, which would be used to pay the costs of construction and would then convert into a permanent loan, with the total loan amount representing no more than 53% of the total value of the RV Park. At that time, InterBank's Term Sheet did not mention, and InterBank was unaware of, the Seller Note.

24.     Based on the Term Sheet and its loan-to-value ratio (the "LTV"), InterBank knew or was told that the RV Park would cost at least $15 million to develop. In connection therewith, Debtor valued the land at approximately $2.2 million, even though Debtor purchased it for far less, and InterBank's own records show that the purchase price was $1.6 million, which was also incorrect because it was purchased for $1.1 million, according to the 2018 closing statement and the CBRE appraisal that InterBank claimed to have relied on.

> **OWNERSHIP AND PROPERTY HISTORY**
> Title to the property is currently vested in the name of Ennis I-45 11 Acres, LLC, which acquired the subject from Olsen Ellsworth/Brown Properties, LLC. The subject tract was acquired as vacant land on July 27, 2018 for $1,100,000. This value appears reasonable based on the concluded

CBRE Appraisal, as later defined, at 11.

25.     To underwrite the loan contemplated by the Term Sheet, InterBank required an appraisal. To get an appraisal, Roland followed InterBank's internal appraisal policies. He sent an Appraisal Order Form to Josh Tucker. Josh Tucker is InterBank's Appraisal Manager, a position he has held since 2021. Josh Tucker manages the "Appraisal Department, appraisal policies, workflow, appraisal reviews, internal market evaluations, and regulatory compliance."

12

26.     Josh Tucker ordered an appraisal through AppraisalShield, an appraisal management system that InterBank uses to bid out and manage the appraisal process. Based on Josh Tucker's order, AppraisalShield sent the appraisal request to multiple appraisers to bid for the appraisal. From those appraisers that responded, Josh Tucker selected C.B. Richard Ellis ("CBRE"), a multibillion dollar internationally acclaimed real estate firm and direct competitors with JLL.

27.     On January 21, 2022, InterBank received the ordered appraisal from CBRE (the "CBRE Appraisal"). The CBRE Appraisal appraised the Property at:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Fee Simple Estate | January 13, 2022 | $3,500,000 |
| Prospective As Complete | Fee Simple Estate | September 13, 2022 | $10,600,000 |
| Prospective As Stabilized | Fee Simple Estate | September 13, 2023 | $11,600,000 |
| Compiled by CBRE | | | |

28.     In compliance with InterBank's appraisal procedures, the CBRE Appraisal was addressed to InterBank c/o Josh Tucker. Josh Tucker signed the engagement letter on behalf of InterBank through AppraisalShield. InterBank received the appraisal before anyone else, including Debtor. InterBank paid for the appraisal and sought reimbursement for it. All these steps were consistent with InterBank's appraisal procedures.

29.     Ultimately, consistent with InterBank's procedures, Debtor reimbursed InterBank for the CBRE Appraisal. Debtor's general ledger reflects a check dated January 14, 2022, made payable to InterBank in the amount of $4,500 for the purpose of reimbursing InterBank for the CBRE Appraisal's cost. In the loan's future closing statement in July 2022, the CBRE Appraisal's cost is referenced as "POC" for Paid Outside of Closing.

30.     Also, consistent with InterBank's appraisal procedures and review guidelines, InterBank sent the CBRE Appraisal to an outside reviewer, Parrish Property Services ("Parrish"), after Josh Tucker did an initial review. Within nine days after InterBank received the CBRE Appraisal, Parrish approved it as "Acceptable" and sent Josh Tucker a six-page report of analysis in support of the approval.

31.     The CBRE Appraisal fully complied with InterBank's appraisal procedures: it was ordered by and delivered to Josh Tucker through an appraisal bidding process, it passed Josh Tucker's internal review, it was sent out for review by Parrish, and all of this was completed within a few weeks with minimal involvement from the loan officer and/or borrower.

32.     And InterBank relied on the CBRE Appraisal and its indication of value to determine whether to conditionally approve a loan to the Debtor, albeit for a sum less than called for by the Term Sheet.

## C.  InterBank's First Loan to Debtor and the Risk of First Lien's Foreclosure

33.     Before InterBank could fully consider its $8 million loan contemplated by the Term Sheet, Debtor needed money fast. And Roland got Underwood and Smith to approve an $850,000 bridge loan via email (the "First IB Loan").

34.     On April 28, 2022, Debtor owed Dry Built money, and Debtor had to soon repay the Seller Note because it was maturing. Accordingly, Roland orchestrated the First IB Loan. It was not a construction loan, a draw loan, or an acquisition loan. Rather, Debtor received $850,000, less certain closing costs to be repaid in two months.

35.     The First IB Loan shows no correlation to the Term Sheet because its terms, amounts, uses, and other provisions are vastly different. Moreover, while Smith claimed during deposition that he knew of the Seller Note when approving this $850,000 loan, the credit

memorandum reviewed by Underwood and Smith, the only two approvals for the First IB Loan, stated the exact opposite; that is, it stated that Debtor owned the Property "free and clear" of any other liens or encumbrances. This explains why the First IB Loan ended up taking a backseat to the Seller Note, so the First IB Loan was subordinate to the Seller Note, particularly given the timing that the First IB Loan was made a mere three months before the Seller Note matured yet does not satisfy or even contemplate that forthcoming maturity.

36.     The First IB Loan was closed by Gage Roland with Debtor's principals. There was no attorney involved, nor was any title company involved at closing. Roland was the loan officer, and he only needed approval from Underwood and Smith, who together were authorized to approve loans up to $999,999.99 without a loan committee review. And the First IB Loan's closing statement confirms that there were no attorneys involved because it does not reflect any customary amounts paid for legal expenses.

37.     With the First IB Loan in place, Roland delayed the closing of the loan anticipated by the Term Sheet. But, at the time Roland closed the First IB Loan, the Seller Note remained outstanding, had come due, and was secured in first lien position by the Property.

38.     The holder of the Seller Note notified Debtor, who notified Roland, that he planned to foreclose on his Seller Note. The Seller Note's potential foreclosure risked the First IB Loan. This was the first mess Roland created. In his haste to close the First IB Loan, Roland originated a loan for InterBank that was subordinate to the Seller Note.

39.     Therefore, the threat of foreclosure and losing $850,000 for InterBank, along with alleged claims of pressure from Debtor's principals[3], ████████████████████████████

---

[3] ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████. He then set out to refinance the First IB Loan, including paying off the Seller Note, something that was never contemplated by the First IB Loan's approval, according to any document that existed at the time.

**D. InterBank's Second Loan to Debtor**

40.     The First IB Loan that closed on April 28, 2022, was only a bridge loan set to mature in 60 days with an option to extend for another few months. ██████had to get the First IB Loan refinanced quickly so Debtor would not be in default and to address the Seller Note. The Term Sheet called for an $8 million construction loan. But the CBRE Appraisal would not allow for it based on InterBank's internal LTV policy, which required no more than 60% LTV.

41.     Therefore, on July 18, 2022, InterBank loaned Debtor $7 million ("Current IB Loan"), an amount less than contemplated in the Term Sheet. The Current IB Loan's CLA provides as a condition:

> (f)     Lender shall have received and approved a written appraisal of the Property prepared for Lender by a duly licensed and qualified commercial real estate appraiser in form, scope and substance acceptable to Lender in its sole and absolute discretion, reflecting an "As Complete September 2022" value of not less than $10,600,000.00 and an "As Stabilized September 2023" value of not less than $11,600,000.00 which appraisal shall be furnished at Borrower's sole cost and expense;

42.     The two figures noted above are identical to the figures set forth in the CBRE Appraisal. Further, the CLA also includes a maximum 60% LTV covenant, which directly ties the CBRE Appraisal's $11.6 million figure to the $7 million amount of the Current IB Loan.

_____

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

16

43.    Accordingly, for the Current IB Loan, InterBank relied on the values in the CBRE Appraisal.

### E.  The Bigger Mess Made ██████████

44.    The Senior Loan Documents (as defined in the ICA), identified in Exhibit B and incorporated by reference in the Current IB Loan, include, inter alia, the Promissory Note, Deed of Trust, and CLA. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ .[4]

45.    █████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ . And, then, Roland processed the loan.

---

[4] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███

Date:    6/21/2022 4:21:23 PM
Subject:    FW: Ennis I-45 11 Acre, LLC - Executive Summery
Attachments:    Ennis I-45 Executive Summary - updated.doc
Ennis I-45 11 Acres LLC.pdf

This request has been approved by DLC subject to Gage's verification of all costs that have been paid by the borrower to date.
\"

Mike Sterkel
Senior EVP
Sr. Lender- President OK Region
Mike.Sterkel@interbank.com | www.interbank.com



Underwood 30(b)(6) and Reb. Expert Dep. 106:6–14.

46.

47.

48.     For example, the incomplete closing statement for the Current IB Loan shows the use of the loan's proceeds that InterBank, inter alia, refinanced the First IB Loan and the Seller Loan.[6]

49.     The closing statement also asserts that an origination fee in the amount of $25,000 was paid to InterBank and legal fees in the amount of $7,500 were paid to Melissa Tucker's law

---

[5] Likely, InterBank cannot explain it because it would have to explain that the Current IB Loan was not approved, and this is why Roland hid the loan.

[6] The terms are styled as the "Prior Owner Loan" and "Prior InterBank Loan" but are not defined in the loan documents as a typical commercial title company, lender, borrower, or real estate counsel would expect.

firm.

50. But the Senior Loan Documents require an origination fee of $35,000, which equates to 0.5% of the principal, a standard amount. InterBank admits it received only $25,000 in accordance with the closing statement. Thus, the $25,000 payment did not satisfy Debtor's obligations under the Senior Loan Documents and constituted a material breach of those agreements from the first day of the Current IB Loan, which continues to this day.

51. ███████████████████████████ ██████████ ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

Accordingly, the closing statement is false to the extent that it asserts that the legal fees were paid. But InterBank funded that money, it was paid to someone, no account statements show that money was ever recovered, and at least those that "cleaned up" the loan—Frazier and Melissa Tucker— knew this. If InterBank funded the money, which InterBank claim it did, the misuse of loan funds is a material breach of the Senior Loan Documents.

F. ████████████████████████████████

52. Dated November 1, 2022, a memorandum in Debtor's records states the following:

1. The lender has some serious problems with our loan's documentation and the handling of our loan.

2. Was it the banks responsibility or is it a requirement to get new title policy upon funding their loan?

3. It took several weeks for the bank to pay off the first lien holder after funding our loan.

4. ████████████████████████████████████████████ now the

---

[7] Underwood was one of four witnesses designated by InterBank as a corporate representative. Underwood was also designated by InterBank as rebuttal expert witness to rebut the testimony and opinions of Bay Point's expert Robert Unell. For her deposition, Underwood was noticed as a fact witness, corporate representative, and rebuttal expert, in accordance with the designations.

==branch president [Frazier] is handling our loan== and others that seemed to have problems based on the President's comments. - John insert your conversations

5.   ==Now, the bank has hired what appears to be a solo law firm who is asking for documents that appear not to be relevant.== She is asking for the names and addresses of our 60 members—our position is this is confidential. The members only responsibility was their capital contributions. They have a list of the members' bank deposits.

6.   John tried to open a new bank account from another deal, and the Bank made it difficult. This was several million dollars. So, we think we should just pass on new business here.

53.   At some point prior to the drafting of this Memorandum, InterBank learned of certain issues with respect to the Current IB Loan. InterBank retained Melissa Tucker (again) to investigate. During this investigation, at a minimum InterBank discovered or confirmed that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████.[9]

54.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

█   ████████████████████████████████████████████████

████████████████████████████████.

---

[8] ████████████████████████████████████████████████████████████.

[9] ████████████████████████████████████████████████████████████

- ██████████████████████████████████

  █ ████████████████████████████████████
  ████████

██ ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ .

## G. The "Clean Up" Begins

56.  ████████ reported directly to Underwood. Underwood and Frazier are co-presidents of the Community Bank in Ellis County (formerly, President and CEO of Vintage Bank). ██████

██████████████████████████████████████████ .

57.  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ."



Smith 30(b)(6) and Reb. Expert Dep. 55:22–56:2.

58.  ████████████████████████████████████

██████████████████████████████████████████ .

21



Frazier 30(b)(6) Dep. 41:15–24.

59.



Frazier 30(b)(6) Dep. 47:16–20.

60.     In contrast to Frazier's testimony, documents show that he was active in cleaning up the loan. For example, in October 2022, Frazier documented that the Current IB Loan had numerous issues. He sent a memo to Debtor in response to a draw request that raised a number of questions about the draw request form, the amounts requested, and other information related to the Project. Frazier also commented within InterBank regarding certain issues, including that InterBank had not verified the equity contributions from Debtor's owners, as required by the Directors' Loan Committee before closing and the Senior Loan Documents before advancing

22

funds. Frazier also noted (i) questions regarding draw processing irregularities, (ii) the loan administration did not use the standard required AIA forms, and (iii) most importantly, Debtor's construction budget was blown.

61.     Accordingly, as of at least late 2022, InterBank was aware of numerous issues with Debtor's Current IB Loan and Project that constituted Events of Default under the Senior Loan Documents.

62.     According to InterBank's testimony, the most critical issue with the Current IB Loan was the unrecorded Deed of Trust. InterBank was aware of the unrecorded Deed of Trust ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ in early October 2022 but waited to record the Deed of Trust until December 8, 2022, and InterBank claims to not know why.

63.     InterBank thought it prudent to get title insurance. Therefore, it put the Current IB Loan through title. Based on information provided to the title company by Frazier and Melissa Tucker, InterBank received title insurance for the Current IB Loan in February 2023. InterBank cannot explain why it took five months to get title insurance after ▆▆▆▆▆▆▆▆ ▆ Frazier took over the loan.  Notably, the title insurance provider that ultimately issued the policy was different from the title insurance provider originally contemplated ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆

64.     Further, the Current IB Loan was subject to late charges for failure to make timely interest payments. Frazier used his discretion to "reverse" the late charges without any paperwork or notations anywhere in the loan file, so the late payments would no longer show up in Debtor's accounting records or loan history.

65.     Underwood and Frazier testified that, by December 2022, InterBank knew that it would not loan any additional money to Debtor, despite the RV Park being midway through

23

construction and the Debtor having spent its $8 million equity investment and the $7 million

InterBank loan funds.

```
Q.   So it's fair to say that in late '22 -- late
2022 -- excuse me -- InterBank knew it wasn't going to
give more money to the borrower in this case?
   A.   Yes.
```

Frazier 30(b)(6) Dep. 79:2–5.

```
Q.   Okay.  You also said, in December -- by
December of 2022, InterBank knew they weren't giving the
borrower any more money, correct?
   A.   Yes.
```

Frazier 30(b)(6) Dep. 131:16–19.

```
Q.   So it's your knowledge -- and you sit on the
DFW Metro Loan Committee.  Was this -- was the borrower
in this case -- was there another loan committee related
to the borrower for this case in December 2022?
   A.   To my knowledge, there was no -- there was
never an additional loan brought -- other than the 850
and the 7 million brought to the DFW loan committee for
the purpose -- for Ennis -- the Ennis I-45 11 Acre
whatever.
```

Underwood 30(b)(6) and Reb. Expert Dep. 82:9–17.

66.     At this stage, the Current IB Loan was at serious risk of default. The Project had

stalled in material violation of the Senior Loan Documents. Debtor was out of money. And

InterBank refused to provide additional funding.

67.     This created a huge problem for InterBank. According to the CBRE appraisal, the

"as is" value of the Property was about $3.5 million. The "as completed" value of the Property

would be $10.6 million. Debtor was at least $3 million short of completion. So, at best, InterBank

had to believe the Property was worth $7 million. But it is difficult to sell improved but unfinished

24

commercial property. Any buyer interested in these types of property is looking for a deep discount, which is generally known to lenders. Thus, InterBank's collateral for the Current IB Loan was significantly impaired, according to the appraisal relied on by InterBank. Plus, Debtor told InterBank it was out of money and was going to default on the Current IB Loan. If InterBank foreclosed, it would likely take over or sell property worth a fraction of its loan value. InterBank was out of options unless it could work with Debtor to find another lender to fund the remainder of the Project. But, as a commercial lender, it knew no lender would finance a Project with all of these issues from origination to present that also was already leveraged at 60% LTV.

68. So, Debtor and Frazier conspired to "clean up" the loan some more. Debtor would engage JLL to be its debt broker. Frazier would engage JLL to appraise the Property for far more than the market value. Frazier would ensure that the appraisal appeared to have gone through InterBank so that it was official. And then Debtor, InterBank, and JLL would work together to get someone to first provide enough funding to finish the Project and then get someone to refinance both loans and take out InterBank. ███████████████████

███████████████████████████████████████████

█████████████

| | |
|---|---|
| From: | Jeff Frazier |
| To: | Prescreen |
| Subject: | June 30 Prescreen |
| Date: | Monday, June 26, 2023 4:06:14 PM |
| Attachments: | image889184.JPG ████████ |

For Friday's Prescreen Call:

████████████████

████████████████

███████████████████████████

Ennis I-45 11A LLC – $7,000,000 loan for the construction of a luxury RV park in Ennis, Tx on I-45. Park is 85+% complete and we have funded $6,366,941 to date. Borrower is seeking a Mezz loan in the amount of $3,600,000 to fund cost overruns due mainly to a redesign that picked up 4 additional spaces, concrete and utility cost increases, upgrades that include awnings, and a dog park that were not in the original budget, etc. Legal is working on the intercreditor agreements. JLL has indicated they will take us out shortly after C/O. JLL appraised the property on March 16, 2023 for $21,200,000 at completion and $30,800,000 at stabilization.

25

**H. The JLL Appraisal**

69.     In February 2023, InterBank engaged JLL to perform an appraisal of the RV Park (the "JLL Appraisal") despite InterBank having the CBRE Appraisal in its files and, as learned later, despite the appraisal already being underway, as known by Frazier and Josh Tucker. The engagement letter was addressed directly to Frazier, as President of InterBank.

70.     InterBank purports to maintain strict separation between the loan originators/officers and the appraisal department. Indeed, Josh Tucker testified that **all** appraisal engagements are required to be directed through his office, he is required to negotiate and execute **all** engagement letters for appraisers, and that **all** appraisals are to be delivered to his office for review and further direction. The purpose, according to Josh Tucker, is to ensure that InterBank receives a truly independent appraisal, free from untoward influence by a loan officer.

71.     Unbeknownst to Josh Tucker, Frazier and Debtor hired JLL to conduct an appraisal of the Property without following protocol, again despite InterBank having the recent CBRE Appraisal in its files (an appraisal that conformed perfectly to InterBank's appraisal policies).

72.     The JLL appraisal was allegedly already underway as of February 22, 2023, when Frazier signed an engagement letter directed to him by JLL. Having an engagement letter directed to, reviewed by, and executed by someone outside of Josh Tucker's appraisal department violated InterBank's policies and procedures, according to Josh Tucker.

73.     The order for JLL to perform an appraisal was entered into AppraisalShield at 4:42 p.m. on February 22, 2023. AppraisalShield, as its name may suggest, is designed to ensure that appraisals are independently and properly completed and managed by a bank. Moreover, Josh Tucker explained that to be valid an appraisal had to be ordered by the bank, addressed to the bank, and delivered to the bank. But the JLL Appraisal was anything but the sort.

26

74.     Despite InterBank's appraisal requirements, **a mere one minute after the appraisal order was entered in AppraisalShield**, the appraisal assignment for the Property was manually "awarded to" JLL. In other words, the independent and competitive (and protected) bidding process was completely bypassed.

75.     When Frazier reached out to Josh Tucker to order the JLL Appraisal, Frazier explained that Debtor was seeking an appraisal for refinancing or possibly additional funding and asked if Josh Tucker could have InterBank take it over to save Debtor money from having to have two appraisals made—one for Debtor and one for a financial lender.[10]

```
Q.   And so, I want to -- I'm trying to get the timeline
down a little bit.  So he -- he called you and e-mailed you,
and said:  We need to get the appraisal to save the borrower
money through JLL, and we're gonna -- and we need to put it in
the bank's name, so that way the bank can use it; is that
correct?
     A.   Not exactly how I stated it.  He just asked if we
would be able to take over -- or basically, what we needed to
do because the borrower had already ordered an appraisal.  And
I said:  Well, we can technically take it over, but it needs to
 be in our name to be able to be used for any sort of financial
institution lending.
```

76.     But Josh Tucker told Frazier that JLL must send the engagement letter to Josh Tucker and that his team would manage the appraisal management process. Despite flagging these issues for Frazier, once the order was in AppraisalShield, Frazier took no further steps to ensure that InterBank's policies were followed in connection with the JLL Appraisal. Indeed, Frazier signed the engagement letter on the same day that Josh Tucker ordered the appraisal from JLL.

---

[10] Importantly, both Underwood and Frazier testified that by December 2022 InterBank knew it was not going to provide any additional funds to Debtor. Thus, the JLL Appraisal was a concerted effort between Debtor, InterBank (through Frazier), and JLL to create an appraisal in February 2023 to get additional funding from a financial lender that would need the appraisal in InterBank's name instead of Debtor's name.

Frazier also set it up for the JLL Appraisal to be delivered directly to Debtor. And Frazier set it up for Debtor to pay for the JLL Appraisal directly. Moreover, Frazier never disclosed to Josh Tucker that JLL was both preparing the appraisal and brokering the debt (to Bay Point). All of Frazier's actions violate InterBank's appraisal policies.

77.     JLL's protocol for delivering the JLL Appraisal to InterBank differed substantially from CBRE's protocol to deliver the CBRE Appraisal. For example, the JLL Appraisal was requested by and went directly to Frazier—not through Josh Tucker and his team. Further, unlike what happened with the CBRE Appraisal and InterBank's usual appraisal process, the JLL Appraisal was not reviewed by a third party, and Parrish had no overview of it.

78.     This JLL Appraisal violated InterBank's appraisal policies according to InterBank's Appraisal Manager, Josh Tucker:

```
    Q.   Got it.  So -- so in this case, we had a bunch of
things that it sounds like, to me, were outside the norm of --
of your appraisal process, as I understood it.  So I want to
walk through them and you can tell me whether I misunderstood
it or not?
    A.   Okay.
    Q.   The first one is:  The borrower picked the appraiser.
That's outside your normal process, isn't it?
    A.   Generally, yes.
    Q.   Okay.  The loan officer appears to be involved in the
appraisal process?
    A.   It's -- like, I was actually communicating with the
appraiser, but I don't know what communication occurred between
Jeff and the appraiser.
    Q.   Okay.  Mr. Frazier signed the engagement letter.
That seems like it was outside your process?
    A.   Yes.
    Q.   Okay.  The engagement letter was amended -- amended?
    A.   Yes.  I did not see a countersignature, but yes.
```

28

79.     The engagement letter attached to the JLL Appraisal indicated that it was to be used for an "Internal Business Decision." When questioned, none of InterBank's designated corporate representatives could identify the "internal business decision" for which the JLL Appraisal was required. Indeed, it was quite a curious designation, as InterBank had already determined that it was not going to loan any additional funds to Debtor several months prior. Josh Tucker testified that Frazier told him:

```
Q.   Okay.  What did he tell you, again, that the purpose
of this appraisal was?
     A.   I think he just said:  The borrower is wanting to
look at getting, maybe, additional funds or something.  I'm --
I'm not 100 percent sure.  My whole point was to get an
appraisal that followed the scope of work.
     Q.   Got it.  So you understood it, when you were doing
it, as kind of a refinance; is that right?
     A.   Refinance or possibly additional funding or something
of that nature.  There's -- there's no telling what happens.
```

80.     On March 16, 2023, JLL delivered the JLL Appraisal, which provided an overall value of the RV Park at $30,800,000 in approximately one year, and approximately $20,000,000 as of the date of the JLL Appraisal.

| Market Value Indications | | |
|---|---|---|
| Market Value Conclusion As-Is | $19,600,000 | ($202,062/Pad) |
| Prospective Market Value at Completion | $21,200,000 | ($218,557/Pad) |
| Prospective Market Value at Stabilization | $30,800,000 | ($317,526/Pad) |

81.     The cost of the JLL Appraisal was $6,500.[11] Again, this was paid directly by Debtor on February 23, 2023, as confirmed by a wire from Debtor to JLL Valuation and Advisory Services. It was not reimbursed to InterBank, as was the case for the CBRE Appraisal.

82.     At the time InterBank ordered the JLL Appraisal, InterBank knew the Project was significantly behind schedule and over budget. InterBank also knew, or should have known, about

---

[11] The CBRE Appraisal was only $4,500, but Frazier told Josh Tucker that he wanted, in part, the bank to take over the appraisal management process to save Debtor money.

more material issues with the Project, including missing or misappropriated funds that should have been used to complete the Project. Finally, at or near the time InterBank ordered the JLL Appraisal, InterBank knew that Debtor needed additional funding of no less than $4 million to finish the Project and have the RV Park become fully operational. InterBank was not willing to provide more funding and did not believe that the RV Park's value would cover a total debt obligation exceeding $11 million in total.

83.     InterBank knew that the JLL Appraisal would be presented to and relied on by another lender. That was InterBank's intent—for another lender to advance additional money to only improve the value of InterBank's position, and to the new lender's detriment. To that end, InterBank requested, participated in, and facilitated the manipulation of the final JLL Appraisal to purposefully overstate the RV Park's value. When the JLL Appraisal was first ordered, the original engagement letter ("Original EL") identified the general contractor as the "site visit contact" and "data contact" and identified Bill Moist as the person who will receive the appraisal. The Original EL was not attached to the JLL Appraisal given to Bay Point, but instead an amended engagement letter ("Amended EL") was attached.

84.     Notably, the Amended EL is dated the day immediately preceding delivery of the JLL Appraisal to InterBank. In the Amended EL, the JLL Appraisal is now addressed to InterBank directly and omits reference to Bill Moist. The change made by the amendment is consistent with Josh Tucker's testimony that no appraisal would appear valid unless it was ordered by and delivered to a lending institution. Notwithstanding that Josh Tucker could not identify any reason to amend the engagement letter and further testified that *all* engagement amendments would have to travel through his office, Josh Tucker disclaimed any knowledge of the amendment to the

30

engagement letter for the JLL Appraisal. And, again, despite Josh Tucker's guidance and InterBank's policies otherwise, the Amended EL was addressed to Frazier, not Josh Tucker.

85.     Plus, the Amended EL directly contradicts the Original EL, changing the entire authenticity of the JLL Appraisal. Indeed, as an experienced lender, InterBank knew that an appraisal that is directed and delivered to the borrower (or an agent of the borrower) and lists a borrower (or agents of the borrower) as the only contact person(s) is highly suspect from the outset and would raise serious red flags to a potential lender. Josh Tucker confirmed the same in his testimony. This was also confirmed by InterBank's own expert appraiser in this case, who testified that InterBank uses AppraisalShield to ensure that any appraisal it receives is as accurate as possible and free of any conflict. And the expert testified that he has completed a substantial number of appraisals for InterBank and could not recall a single time being directly engaged by InterBank.

86.     At 12:12 p.m. on March 31, 2023, some two weeks after the JLL Appraisal was delivered to Frazier, InterBank logged receipt of the JLL Appraisal in the AppraisalShield system. Josh Tucker testified that this was when he first received the JLL Appraisal. InterBank has not offered any explanation for why Frazier received the JLL Appraisal two weeks before it was entered into AppraisalShield.

87.     At 12:14 p.m. on March 31, 2023, Josh Tucker entered a note with respect to the JLL Appraisal to "hold on review for right now." Thus, at best, within a few hours of receiving the JLL Appraisal, Josh Tucker and InterBank decided not to send the JLL Appraisal for review by a third party, in violation of its own policies and procedures.

88.     Josh Tucker testified that he compared the JLL Appraisal to the CBRE Appraisal and based on the significant difference in values indicated in each determined that the JLL

31

Appraisal was invalid. As such, the "higher ups" at InterBank (identified by Tucker as Frazier and Smith) did not have any desire to proceed further with the JLL Appraisal, so no review was completed. Josh Tucker entered a formal note in Appraisal Shield on April 11, 2023, stating "NO REVIEW – NOT PROCEEDING FORWARD."

89. Josh Tucker testified that if an appraisal initially appears to have significant problems, the protocol at InterBank is to have the appraisal reviewed and to then return the appraisal to the appraiser with comments so that he or she may address the deficiencies. If the appraisal is significantly flawed, that would constitute grounds for removing the appraiser from InterBank's approved appraiser list.

90. In this case, Josh Tucker did not return the JLL Appraisal to JLL to address any of the deficiencies. He testified that he did not even attempt to get a refund for the Debtor, which is InterBank's client and which (according to InterBank) paid for an appraisal so flawed that it was not even worth going through the review process. This was all, according to InterBank, to "save the Debtor money."

91. As of the date of this Second Amended Complaint, despite the substantial problems found with the JLL Appraisal according to Josh Tucker, JLL remains on InterBank's approved appraisers list and, in fact, was never even reprimanded by InterBank for its appraisal.

**I. JLL as the Debt Broker**

92. At some point prior to April 2023, around the time of the JLL Appraisal, the Debtor engaged JLL to assist in finding additional capital from lenders, including Bay Point (the "JLL Loan Sourcing").

93. Bay Point was provided with the JLL Appraisal addressed to InterBank. Shortly thereafter, Bay Point also engaged in negotiations with the Debtor over potential financing.

Ultimately, Bay Point and the Debtor reached terms in principle and began negotiations over loan documents. Bay Point had some comfort in potentially making a junior priority loan because InterBank was a FDIC and NMLS regulated institution (and advertised itself as such) and thus was subject to significant regulatory oversight with respect to its loan origination and administration. Indeed, Bay Point would not have considered this loan if InterBank was not a FDIC member bank.

### J. Bay Point Negotiates and Closes a Loan to the Debtor

94.      In early summer 2023, Bay Point requested that InterBank agree to an intercreditor agreement. Bay Point's reasons included that Bay Point wanted certain representations and warranties from the senior lender regarding the loan, including that it was in good standing, there were no defaults or circumstances that would create a default, and there were no material adverse events with respect to Debtor.

95.      InterBank, through Frazier, sent the first draft of an intercreditor agreement to Bay Point. The parties engaged in negotiations that ultimately ended with Bay Point agreeing to fund the loan to Debtor. Negotiations were handled by Melissa Tucker for InterBank, who knew of all of the significant issues with the Current IB Loan. Moreover, at that time, InterBank knew that Bay Point received the JLL Appraisal. InterBank also knew Bay Point was sourced by the JLL Loan Sourcing. InterBank never disclosed it had the CBRE Appraisal from months earlier in its file, nor did it disclose that it rejected the JLL Appraisal. Moreover, InterBank made material representations and warranties so Bay Point would loan the Debtor $4 million to finish the Project. InterBank knew this would result in **only** InterBank having a secured position, given the Current IB Loan's size and the value of the Project (that InterBank knew but hid from Bay Point). At the time, InterBank knew it had significant problems with the Current IB Loan.

96.     InterBank was desperate to bring in a new lender such as Bay Point to assist in shoring up its collateral, the RV Park, and its value. InterBank knew that the RV Park did not carry the value set out in the JLL Appraisal, which was confirmed to Bay Point by Terry Smith during an in-person meeting in the spring of 2025 with Mitchell Dagley, Bay Point's Managing Director of Loan Originations.

97.     Bay Point's loan to the Debtor closed on August 22, 2023 (the "Bay Point Loan"). At that time, the Debtor, Bay Point, and InterBank executed the ICA. Knowing all the issues with the Current IB Loan, including those that constitute Events of Default and Material Adverse Events under the Senior Loan Documents and ICA, Frazier executed the ICA on behalf of InterBank. Pursuant to the Bay Point Loan, Bay Point agreed to and did loan the Debtor funds in the total amount of $4 million.

98.     To get Bay Point to close on the loan with the Debtor, InterBank made multiple representations and warranties in the ICA, including those concerning the condition of the RV Park and Debtor's financial hygiene (or lack thereof). Bay Point relied on these representations and warranties when it agreed to make the Bay Point Loan, which Bay Point deemed to be critical to its decision.

99.     In the ICA, inter alia, InterBank represented and warranted that it had complied with its regulatory obligations and further expressly represented and warrantied that:

    a.   InterBank knew of no current Events of Default or event that would constitute an Event of Default in the Senior Loan Documents, including the CLA.

    b.   InterBank was the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

    c.   InterBank made its own credit analysis and decision to extend and advance the Senior Loan to Debtor based on such documents and information as it has deemed appropriate.

34

d.  InterBank agreed that the ICA was enforceable against it in accordance with its terms subject to applicable bankruptcy laws and general principles of equity.

e.  The performance of the ICA and the consummation of the transactions contemplated by the ICA (*e.g.*, the CLA, the recording of the Deed of Trust, etc.) did not constitute a violation by InterBank of any statute, law, or regulation that is applicable to InterBank.

**K.  InterBank's False Representations and Warranties.**

100.  When the ICA was executed, InterBank knew, or should have known, the following circumstances existed or occurred:

a.  The Debtor did not hold its bank accounts at InterBank, as required by Section 11(f) of the CLA. Instead, the Debtor had accounts at InterBank, Chase, and Prosperity. InterBank knew this because it sent wires from the Debtor's InterBank account to Debtor's Chase account. InterBank also authorized Joe Grisel ("Grisel"), who had no affiliation with the Debtor, to be an authorized signatory on InterBank's account for the Debtor. Indeed, Bay Point learned the Debtor opened an InterBank account late into the Project—even though it was a requirement under the CLA.

b.  Debtor had failed to remain compliant with the "Approved Budget," which limited the development costs to $14,150,000 as required by Section 12(o) of the CLA and the Approved Budget attached thereto. InterBank knew that the Debtor had already failed at this requirement.

c.  Debtor had not paid the entire origination fee.

d.  Section 12(m) of the CLA provided that any work stoppage of more than 21 days would constitute an Event of Default. Work on the Project ceased for more than 21 days.

e.  The CLA requires that there be 60% LTV at all times, otherwise a Material Adverse Event will have occurred as defined by Section 2 of the CLA. At the time of the ICA,

35

InterBank knew this covenant was breached. Indeed, InterBank knew that the JLL Appraisal being relied upon by Bay Point would create an appearance that this covenant was satisfied but also knew that it had rejected the JLL Appraisal instantly and that the CBRE Appraisal set out the accurate value for the RV Park.

f.    Pursuant to Sections 10 and 11(b) of the IBCLA, the Debtor was required to maintain and provide accurate financial records. The Debtor never provided financial and accounting records to InterBank as required—a fact known by InterBank.  Moreover, by this point, Frazier had reversed at least two late charges, thus hiding them in Debtor's records.

g.    Pursuant to Section 11(z) of the CLA, the Debtor was prohibited from making distributions that would impair the Debtor's ability to comply with the Current IB Loan's loan documents and satisfy its obligations thereunder. Yet, the Approved Budget shows funds represented as having been invested in the Debtor were either not invested or were distributed outside of the confines of the Approved Budget, which was known by InterBank.

101.    Further, InterBank's own records show concerning financial circumstances in the days leading up to Bay Point loaning additional funds to Debtor. For example, while Bay Point was considering making a loan to Debtor, which was known to InterBank, Debtor missed the interest payment due on May 30, 2023, by more than 10 days. Frazier reversed the late charge through internal accounting actions but did not disclose this late payment to Bay Point in connection with the ICA or negotiations related thereto. This was not the first time Frazier internally reversed missed or late payments and related charges in Debtor's banking records; for instance, he did so in late 2022 as well. InterBank knew that Bay Point would rely on Debtor's financial history of making its loan payments, which necessarily would include prior defaults that were not disclosed by InterBank.

36

102.     Just a few days before Bay Point closed its loan, InterBank advanced an additional $586,247.75 to Debtor, which is reflected in the accounting records maintained by InterBank:

| Date | Type | | | | Balance | Note |
|---|---|---|---|---|---|---|
| 05/04/2023 | Rate Change | 0.00 | 0.00 | 0.00 | 6,183,436.01 | 8.50000000 To 8.75000000 |
| 05/30/2023 | Late Charge | 2,184.22 | 2,184.22 | 0.00 | 6,183,436.01 | Automatic |
| 06/05/2023 | Late Charge Cr Adj | 2,184.22 | 2,184.22 | 0.00 | 6,183,436.01 | PER OFFICER |
| 06/05/2023 | Advance | 136,314.14 | 136,314.14 | 0.00 | 6,319,750.15 | To  DDA XXXXXX9350 INTERIM D |
| 06/05/2023 | Regular Payment | 43,684.44 | 0.00 | 43,684.44 | 6,319,750.15 | |
| 06/22/2023 | Advance | 47,191.64 | 47,191.64 | 0.00 | 6,366,941.79 | To  DDA XXXXXX9350 PER BILL: D |
| 06/22/2023 | Regular Payment | 47,191.64 | 0.00 | 47,191.64 | 6,366,941.79 | From DDA XXXXXX9350 PER BILL: |
| 07/18/2023 | Advance | 46,810.46 | 46,810.46 | 0.00 | 6,413,752.25 | To  DDA XXXXXX9350 Draw for Ju |
| 07/19/2023 | Regular Payment | 46,810.46 | 0.00 | 46,810.46 | 6,413,752.25 | |
| 07/27/2023 | Rate Change | 0.00 | 0.00 | 0.00 | 6,413,752.25 | 8.75000000 To 9.00000000 |
| 08/18/2023 | Advance | 586,247.75 | 586,247.75 | 0.00 | 7,000,000.00 | |
| 08/18/2023 | Regular Payment | 49,305.72 | 0.00 | 49,305.72 | 7,000,000.00 | |
| *09/18/2023 | Regular Payment | 54,250.00 | 0.00 | 54,250.00 | 7,000,000.00 | |

103.     At the time the funds were advanced, InterBank and Frazier were finalizing negotiations with Bay Point over the ICA, which happened throughout the summer of 2023. InterBank continuously represented to Bay Point that it fully funded its loan, which was false, as confirmed by the advance of $586,247.75 only a few days prior to Bay Point closing its loan. InterBank never informed Bay Point of this advance as the loan documents were finalized.

104.     John McGaugh confirms the foregoing in the following email:

**John McGaugh**
Ennis I-45 11 Acres, LLC
509 Interstate 45 Service Rd.
Ennis, TX  75119

**July 5, 2023**

Dear Jeff,

I am writing to update you on the budgets for Interbank's remaining loan balance available to E11 that has been set aside for the next 12 +/- months of prepaid interest draws as planned for in the Bay Point mezzanine loan closing. Our records show the remaining balance of **$633,058.21** in available credit as of July 15th, 2023.

Therefore, please use the entirety of the remaining balance of this loan as **prepaid interest to make the next 12 +/- months of interest payments on the outstanding loan balance until it is fully dispersed.**

105.     Banking records confirm that InterBank advanced $136,314 in June 2023. These funds were used specifically to keep the InterBank loan current. In other words, InterBank knew that Debtor could not service its debt obligations to InterBank but instead was robbing Paul to pay

Paul (all of the money was InterBank's) so it could later rob Peter (Bay Point) to pay Paul all the money owed to Paul.

106.    In June 2023, InterBank authorized Grisel to make transactions on Debtor's behalf at InterBank. Grisel is not a member, manager, or employee of Debtor. Moreover, InterBank authorized "single users" to make transactions involving Debtor's accounts at InterBank. Said another way, InterBank knowingly gave the keys to Grisel even though it knew he did not hold an appropriate position with the Debtor to have that extent of authority. And when InterBank authorized Joe Grisel to run all of Debtor's bank accounts, InterBank effectively gave him control of Bay Point's funds.

107.    Before Jeff Frazier opened and funded a "retainage account" at InterBank, which purportedly would hold funds representing "retainage," or funds ostensibly due to a builder or general contractor but are being withheld pending final inspections and the issuance of a certificate of occupancy. Jeff Frazier represented as follows:

July 31, 2023

Re: Ennis I-45 11 Acre LLC
     401 N Carroll Ave PMB 166
     Southlake, TX 76092-6407

To Whom It May Concern,

Interbank has currently pledged from Ennis I-45 11 acre LLC, $260,993 in Interest Reserves and $325,254.50 in retainage. Upon receipt of Certificate of Occupancy from the city of Ennis, Interbank will transfer the balance of the retainage funds into the Interest Reserve account. Please feel free to contact me if you have any questions regarding this letter.

Sincerely,

Jeff Frazier
Executive Vice President

38

108. Jeff Frazier's letter is false. At the time he wrote this letter, while the "retainage account" had just been opened at InterBank, it was not funded. Moreover, InterBank at this point was in possession of an Unconditional Waiver and Release, which certified that all work was complete, all subcontractors had been paid, and that all liens were released against the RV Park. If those circumstances are true, then there would be no need for a balance in the retainage accounts, and the account should not have been funded. But Frazier knew that the Senior Loan Documents required the retainage accounts, so he created them in the days leading up to the ICA then delivered the patently false letter to Bay Point, further inducing Bay Point to make the Bay Point Loan.

109. The CLA expressly required that Debtor must have "established with or transferred to [InterBank] all . . .. accounts relating to [Debtor], the Collateral, and the RV Park Resort." Moreover, Frazier knew that the funds did not exist anywhere else, as confirmed by his decision days later to actually make the funding.

110. When Jeff Frazier drafted the July 31, 2023, letter regarding retainage, he knew it would be delivered to Bay Point and relied upon by Bay Point. Put simply, there was no other purpose for the letter. Moreover, these funds were necessary to ensure (i) that interest would be paid on the InterBank loan, and (ii) that the general contractor was motivated to finish the RV Park. Indeed, the deposit slip reflecting the transfer of $586,247.75 of "retainage" characterizes the transfer as a "draw" and not what it really was, a last-minute funding of the interest reserve and retainage accounts. That means that this transaction is not simply moving funds from one account to another (to make the July 31, 2023 letter accurate) but is actually a new transaction between Debtor and InterBank, with the sole purpose to hide the true circumstances of Debtor at the time. It confirms that Debtor and InterBank cooperated to paint a false picture of Debtor, tellingly on the eve of Bay Point's funding.

111. In short, InterBank funded more than $720,000 *while the ICA was being negotiated, each version of which required InterBank to represent that there were no defaults*, all to paint the picture that Debtor was a good and faithful borrower and that the RV Park was sound collateral, with Debtor having long-standing and sufficient interest reserves and retainage funds available, all of which InterBank knew was false but necessary to attract a lender like Bay Point. Further, the sequencing on the retainage account shows

112. InterBank's intent to mislead Bay Point: (i) Dry Built issued a lien waiver; (ii) the following day, for the first time InterBank opens a retainage account; (iii) a few days later InterBank issues a false letter stating that the retainage and interest reserve are well funded and InterBank knew that Bay Point had the Senior Loan Documents in possession and was finalizing underwriting; and (iv) on effectively the eve of the Bay Point Loan closing, InterBank made misleading transactions in an effort to clean this up (and deceive Bay Point).

113. If InterBank had not made these material misrepresentations and manipulations of Debtor's financial history and the-then-current-and-actual circumstances, Bay Point would not have executed the ICA and would not have made the Bay Point Loan to complete the Project. But Bay Point relied on InterBank's statements in the ICA that were knowingly and materially false when made and that InterBank would not take the foregoing actions without disclosing the same to Bay Point.

114. InterBank also represented and warrantied that there had been no "material adverse event," defined as:

"Material Adverse Event" means any act, event, condition, or circumstance which Lender determines, in its sole and absolute discretion, is likely to materially and adversely affect (i) the business, condition (financial or otherwise), operations, capitalization, liquidity, properties, or assets of Borrower or of Borrower and the Obligated Parties, if any, taken as a whole, (ii) the value of the Property, such that the total principal amount outstanding under the Note exceeds sixty (60.00%) of the "as-complete" appraised value of the Property or sixty percent (60.00%) of the "as-stabilized" appraised value of the Property pursuant to the most recent written appraisal of the Property prepared for Lender by a duly licensed and qualified commercial real estate appraiser acceptable to Lender, and in form, scope and substance satisfactory to and approved by Lender in its sole discretion, (iii) the ability of Borrower or any Obligated Party to perform such Person's obligations under any Loan Document to which such Person is a party or by which such person is bound, including, without limitation, the ability of Borrower to achieve Completion of the Project by the Completion Date, or (iv) the enforceability of any Loan Document if Borrower and/or any Obligated Party (as applicable) does not execute and deliver, or cause to be executed and delivered, to Lender within five (5) days after receipt thereof, such documents as may be required by Lender in its sole discretion, to cure such defect in enforceability.

115.     The "mess" of the Current IB Loan's closing and the "clean up" associated therewith, the RV Park's construction issues, the Debtor's finances, the missing or misappropriated construction loan funds, the construction cost overruns, the construction delays, the above-required financial transactions, the inflated and invalid JLL Appraisal that was summarily rejected by Josh Tucker, the complete failure of InterBank to follow its own procedures and protocols in connection therewith, the existence of the CBRE Appraisal that was not disclosed, and many other factors each constituted and certainly collectively constituted a Material Adverse Event. ***They were all known to InterBank.*** Yet, when the ICA was drafted by Melissa Tucker and executed by Frazier, InterBank never disclosed any Material Adverse Events but instead hid them.

116.     If InterBank disclosed any or all of the above Material Adverse Events, or refused to represent and warranty that there had not been any Material Adverse Events, Bay Point would not have executed the ICA and would not have made the Bay Point Loan to the Debtor to finish the Project.

117.     Bay Point retained a third-party construction inspector to ensure that draw requests were properly made, that the work represented to have been completed was in fact completed, and that construction remained on schedule. Bay Point confirmed it disbursed about $3 million for

41

construction costs and those dollars were in fact used to fund construction costs. Meaning, the RV Park was confirmed to have been significantly out of budget—the Debtor having gone through $7 million from InterBank and at least $8 million from investors—before Bay Point made the Bay Point Loan.

### L.  The Condemnation Proceeds.

118.    After Bay Point made the Bay Point Loan, Bay Point learned[12] that a portion of the property upon which the RV Park was constructed was being condemned by imminent domain by the Texas Department of Transportation.

119.    Pursuant to Section 2.3 of the Loan and Security Agreement between the Debtor and Bay Point, of which InterBank was aware, the Debtor was obligated to immediately pay to Bay Point "any proceeds from any . . . eminent domain, condemnation or similar proceedings." Similarly, as InterBank was aware, the Debtor granted Bay Point a security for repayment of its loan a lien in and upon:

> all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding or any settlement in lieu thereof.

Pursuant to Section 1.1.10 the Deed of Trust by and among Bay Point, the Debtor, and Gabriel Toso (as trustee).

120.    Pursuant to the foregoing provisions, the Debtor would not have been entitled to receive any proceeds from any eminent domain or condemnation proceeding.

121.    Section 10(d) of the ICA provides in relevant part:

> In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, [InterBank] shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or

---

[12] Documents show InterBank and Debtor knew about the forthcoming Condemnation Proceeds since January 2023.

consideration arising from any such event (the "Award"). If the amount of the Award is in excess of all Senior Loan Liabilities outstanding under the Senior Loan Documents, however, and either the Senior Loan has been paid in full and all obligations of Senior Lender to make further advances of funds under the Senior Loan Documents have terminated, or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore or repair the Premises, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the Senior Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such Award, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall either (i) honor the final, non-appealable rulings in any interpleader or similar action brought by Mezzanine Lender or any other party with respect to such excess Award and deposit such excess Award into the appropriate court, or (ii) continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the Borrower for the repair or restoration of the Premises shall not be subject to attachment by Mezzanine Lender.

122.   Section 19 of the ICA provides that it "may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought."

123.   In an email dated August 8, 2024, from John McGaugh (with the Debtor) to Mitchell Dagley (with Bay Point), in response to confirmation from Bay Point that none of the condemnation proceeds would be released to Debtor, the Debtor wrote: "TxDOT closing funds will be wired directly to InterBank. All proceeds will be deposited into the InterBank Interest Retainage (IR) account . . . to hold the balance of the funds in the IR account and apply those funds as it sees fit and as its sole right as the first lien holder."

43

124. On August 14, 2024, to get Bay Point to agree to the condemnation's closing, InterBank delivered to Bay Point a letter regarding the condemnation and the proceeds thereof ("Condemnation Proceeds Letter"). InterBank represented that the funds received from the closing of the condemnation sale will be transferred to the interest reserve account established at InterBank for the Debtor. Moreover, InterBank represented that the Debtor "will not be the recipient of any of the funds deposited in that account," although InterBank "reserve[d] the right to direct the disposition of these funds to principal, interest or any other purpose that promote[] the security of the collateral and promotes the efficient repayment of the indebtedness." At the time Frazier wrote this letter, he knew that he intended to disburse a material portion of these funds directly or indirectly to Debtor.

> In an effort to get Baypoint to sign off on the TXDOT settlement, I told them that the funds would be placed in the interest reserve would not go to the group or contractors. I was wrong to do that, but was empathetic to all the struggles they were experiencing. I did run it through the retainage that was replenished which I feel the borrower should have been entitled to the majority of after C/O. I also released the operating and marketing monies because I thought they needed it to keep the project moving forward. Baypoint is upset about the way I've handled the funds.
>
> During all this, John McGaugh has claimed to have an investor that was going to take over the project and pay off our debt and the Mezz debt within 90 days. John also said that he had been approved to refinance the project and they would do that if the investor deal fell through. Neither of these options have come through as of yet.

Oct. 8, 2024 Memorandum from J. Frazier to T. Smith.

125. On November 8, 2024, Bay Point received a document that purports to be the closing payment schedule and check-writing details for the proceeds of the condemnation sale that totaled $1,244,377 (the "Condemnation Closing Statement"). As noted in the Condemnation Closing Statement, Bay Point was paid $197,000 as agreed, $6,926.00 was paid for legal services, and the balance of $1,040,451 was transferred to the interest reserve account at InterBank. The document further appears to indicate that $178,817.00 was transferred to Debtor for "E11 operations" (the "Debtor Transfer"), $272,717.00 was reserved for interest due to InterBank, and $588,917.00 was paid to release liens (the "Lien Release Payment").

44

126.    The Lien Release Payment was purportedly sent to Dry Built, for purposes of paying a lien held directly by Dry Built and in favor of certain subcontractors providing services to Dry Built. But, months before that date, on March 21, 2024, Dry Built executed a certain Unconditional Waiver and Release ("Lien Waiver"), pursuant to which it agreed to use funds to pay all subcontractors (or that had already paid subcontractors) and that it would release all liens it may have against the Property. Bay Point informed InterBank of this, and thus, this is why Bay Point insisted on the Condemnation Proceeds Letter to agree to the condemnation's closing, a requirement for Debtor to close.

127.    On March 20, 2024, an independent inspection of Borrower's property completed by USA Construction Consultants ("USA") confirmed that the funds requested by Dry Built in connection with the Lien Waiver represented work that was completed at the Property. As further noted therein, "based on the draw requests provided for [USA's] review, $0.00 remain in owed hard costs funds." USA estimated that the Project had reached "100%" completion with foundations poured and occupancy started.

128.    At the time of the Condemnation Closing Statement, therefore, there should not have been any further liens because the Project was complete and there was no additional work to be performed at the RV Park by Dry Built (or its subcontractors), and Dry Built previously executed the Lien Waiver certifying that all work was complete and it was paid in full. Further, InterBank's assistant general counsel provided Bay Point a title report showing there were no liens on the Project or Debtor's Property at the time the funds from the condemnation proceeds were distributed by InterBank.

129.    Even further suspicious, accounting records show that payment was not made to Dry Built but instead was made to an entity called "Price Drop LLC" ("Price Drop"), which is

45

owned by Grisel's stepdaughter. Price Drop is in the business of selling trinkets online and was not a contractor or an entity that had any dealings whatsoever with real estate development.

130.   Approximately two months after Frazier authorized and completed the transfer of nearly $600,000, representing the Lien Release Payment, Frazier drafted the following request, confirming he and InterBank did not do the diligence required before these significant funds were sent out (effectively to Debtor or its insiders):

> Can you please send those? Can I also get a final accounting on the $588,917 that was sent to Price Drop LLC?
> Thanks.
>
> **Jeff Frazier**
> Executive Vice President
> Community Bank President
> Jeff.Frazier@interbank.com | www.interbank.com
> 300 N. Highway 77
> Waxahachie, TX 75165
> Office: 972-935-5222
> NMLS ID: 407583

131.   Thus, ███████████████████████████████████████████████; Frazier made transfers of hundreds of thousands of dollars without undertaking simple and necessary diligence to confirm the validity of those transfers.

132.   The Lien Release Payment paid fake liens that did not exist. InterBank knew, or should have known, that this payment was for a fake lien. And this was confirmed by Jeff Frazier when he asked for an accounting of these funds *two months* after he personally authorized and completed the transfer of these funds.

133.   InterBank was also aware of the Condemnation Proceeds Letter and its prohibition on funds being sent to the Debtor. InterBank was also aware that Bay Point had a lien on funds representing condemnation proceeds that was senior to any interest held by Debtor or any insider or affiliate of Debtor. And for that reason, InterBank in the Letter expressly agreed to take protective steps with respect to the condemnation proceeds. Yet, InterBank authorized the Lien

46

Release Payment, expressly violating the ICA, the various loan documents to which the Debtor was a party, and its false agreements in the Condemnation Proceeds Letter.

## V.   Causes of Action

### A.  Declaratory Judgment (Count I)

134.   Bay Point re-alleges and incorporates paragraphs 1 through 133 above in support of Count I.

135.   Under Texas law, Bay Point is the first lienholder of the Debtor's property because the conveyance of the Deed of Trust to InterBank was void to Bay Point, a nonparty to the Deed of Trust, since it was filed without statutory authorization. The Court should declare it so.

136.   "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . . Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

137.   This is a case of actual controversy within this Court's jurisdiction. InterBank claims in the ICA, its pleadings and motions in Debtor's Bankruptcy Case, this Adversary Proceeding, and in a recorded unrecordable Deed of Trust asserts that it is the first lienholder on Debtor's Property with a priority over the lien created by the Deed of Trust conveyed to Bay Point by Debtor. Bay Point disagrees. Bay Point contends it is the first lienholder and has priority over all other creditors to Debtor's Property and InterBank does not have priority lien above any creditor and is thus a general unsecured creditor of Debtor's estate because it recorded an unrecordable Deed of Trust that does not constitute required notice of a lien to creditors under Texas law. Accordingly, Bay Point seeks a declaration from this Court that it is the first lienholder of Debtor's Property, and the Court should declare it so.

47

138.     Under Texas law, "[a]n instrument conveying real property may not be recorded unless it is signed and . . . acknowledged or sworn to before and certified by an officer authorized to take acknowledgements or oaths, as applicable," such as a notary public. Tex. Prop. Code § 12.001(b)(1); *Alvarado v. Alvarado*, No. 13-00-690-CV, 2002 WL 1072067, at *5 n.6 (Tex. App.—Corpus Christi May 30, 2002, rev. denied). A "transaction, not subscribed to by witnesses or acknowledged by a notary public at the time it was drafted, [is] therefore incapable of being properly recorded." *Alvarado*, 2002 WL 1072067, at *5 n.6.

139.     "A conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law." Tex. Prop. Code § 13.001(a) (emphasis added).  In other words, "a defect in the acknowledgment of an instrument conveying real property renders the documents unrecordable." *Kelly v. JPMorgan Chase Bank, N.A.*, No. 3:12-CV-3374-N-BK, 2013 WL 874863 (N.D. Tex. Jan. 11, 2013), *R. & R. adopted sub nom. Kelly v. JP Morgan Chase Bank, N.A.*, No. 3:12-CV-3374-N-BK, 2013 WL 874858 (N.D. Tex. Mar. 11, 2013).

140.     Importantly, "a document filed for record without statutory authorization does not impart constructive notice to third parties."  *Whoa USA, Inc. v. Regan Props., LLC*, No. 05-13-01412-CV, 2014 WL 6967852, at *7 (Tex. App.—Dallas Nov. 26, 2014) (citations omitted) (emphasis added).

141.     ████████████████████████████████████████████
████████████████████████████

█ ████████████████████████████████████
████████████████████████████████████
████████████████



142. InterBank, after having Melissa Tucker complete her investigation, and learning of the foregoing, nonetheless recorded the Deed of Trust. InterBank did not have Debtor execute a new Deed of Trust.

143. Because the Deed of Trust was not acknowledged by a notary public at the time Moist signed it on behalf of Debtor, or Moist signed the Deed of Trust outside the presence of the notary public that notarized the Deed of Trust, the Deed of Trust was (and is) unrecordable and void as to Bay Point, a creditor, under Tex. Prop. Code §§ 12.001(b)(1) and 13.001(a).

144. Under these circumstances, the Deed of Trust conveyed to InterBank does not impart constructive notice to Bay Point, or any other creditor or third party to the Deed of Trust, that InterBank has a lien on the Property. Accordingly, InterBank does not have a lien on the

49

Property to anyone except Debtor—a party to the Deed of Trust. And InterBank could not have a priority lien over the Deed of Trust and security interests conveyed to Bay Point.

145.     Therefore, Bay Point is the first lienholder to all creditors and third parties to the Deed of Trust, and the Court should declare it so by judgment.

**B.  Violation of the Texas Fraudulent Lien Statute (Count II)**

146.     Bay Point re-alleges and incorporates paragraphs 1 through 145 above in support of Count II.

147.     InterBank violated the Texas Fraudulent Lien Statute to Bay Point's detriment and caused Bay Point damages.

148.     The "elements of a fraudulent-lien claim under Chapter 12 of the civil practice and remedies code are (1) the defendant made, presented, or used a document with knowledge that it was a fraudulent lien, (2) the defendant intended that the document be given legal effect, and (3) the defendant intended to cause plaintiff physical injury, financial injury, or mental anguish." *Merritt v. Davis*, 331 S.W.3d 857, 860 (Tex. App.—Dallas 2011, no pet.) (first citing *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 896–97 (Tex. App.--Dallas 2008, no pet.); and then citing Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)).

149.





150.    Because the Deed of Trust was not acknowledged by a notary public at the time Moist signed it on behalf of Debtor, or Moist signed the Deed of Trust outside the presence of the notary public that notarized the Deed of Trust, the Deed of Trust was (and is) unrecordable and void as to Bay Point, a creditor, under Tex. Prop. Code §§ 12.001(b)(1) and 13.001(a).

151.    The unrecordable Deed of Trust was made by InterBank. The Deed of Trust was prepared by Melissa Tucker, an attorney engaged by InterBank. Morgana Terry, an InterBank employee and notary public, notarized the Deed of Trust at a time and place outside the presence of the Debtor's representative Bill Moist that signed and conveyed the Deed of Trust to InterBank.

152.    InterBank, through Melissa Tucker, Jeff Frazier and others, presented and used the unrecordable Deed of Trust by providing the same Deed of Trust to Madison Title Agency to record with the Property's county and to obtain title insurance, attaching and incorporating it by reference into the ICA to create a contractual priority lien above Bay Point, and by attaching it to Court proceedings to falsely convince the Court that InterBank is the first lienholder of Debtor's Property.

51

153.   InterBank, through Pam Underwood, Melissa Tucker, Morgana Terry and others, knew the Deed of Trust was unrecordable and void to third parties and Debtor's other creditors in this Bankruptcy Case and at the time it was recorded with the Property's county. InterBank's corporate representative testified that Morgana Terry, InterBank's credit administrator, told a corporate Executive Vice President, an officer, of InterBank that she was convinced by Roland to notarize the Deed of Trust against InterBank's policies and procedures at the bank branch, outside the presence of the signer, and not at a title company. Moreover, Melissa Tucker and Frazier led an investigation into Roland's conduct, the irregularities with the Senior Loan Documents, and the conduct that constituted Events of Default under the Senior Loan Documents. During their investigation, they would have learned the same information known to InterBank's corporate representative and officer.

154.   InterBank intended for the unrecordable Deed of Trust to be given legal effect. InterBank caused it to be recorded with the Property's county to attempt to give constructive notice to all third parties of its lien on Debtor's Property. InterBank negotiated the ICA with Bay Point, asserting the unrecordable Deed of Trust conveyed to InterBank created a priority over the recordable Deed of Trust conveyed to Bay Point. InterBank provided Debtor a notice of foreclosure to enforce its lien from the unrecordable Deed of Trust when it knew that Bay Point had a recordable Deed of Trust and thus was the Property's first lienholder. InterBank asserted a claim in Debtor's Bankruptcy Case that it is the first lienholder over all creditors based on the unrecordable Deed of Trust. InterBank attempted multiple times to seek relief from Debtor's stay from the Bankruptcy Case, arguing it is the first lienholder. InterBank continues to assert in this Adversary Proceeding that it is the first lienholder. Based on InterBank's conduct, it intended for the unrecordable Deed of Trust to be given legal effect.

155. InterBank intended to cause Bay Point financial injury. InterBank negotiated the ICA to intentionally attempt to subordinate Bay Point's lien from Bay Point's recordable Deed of Trust, knowing that InterBank's Deed of Trust was unrecordable. InterBank misused the DOT condemnation proceeds under the terms of the ICA and its agreement with Bay Point, arguing that it could use the proceeds in any way that it deemed necessary as the alleged first lienholder, which was based on the unrecordable Deed of Trust. InterBank sought relief from stay during the pendency of the Debtor's Bankruptcy Case to admittedly credit bid in its lien amount for the Debtor's Property to retain any value from the Debtor's Property, making Bay Point's lien ineffective and into a general unsecured creditor of Debtor's estate. At every turn, InterBank intended to cause Bay Point financial injury by asserting its unrecordable Deed of Trust created a priority lien that it did not.

156. InterBank's conduct caused economic and non-economic damage to Bay Point. Accordingly, InterBank violated the Texas Fraudulent Lien Statute to Bay Point's detriment, and Bay Point should be allowed to recover damages.

### C. Breach of the ICA (Count III)[13]

157. Bay Point re-alleges and incorporates paragraphs 1 through 156 above in support of Count III.

158. InterBank breached the ICA.

159. Under Texas law, for Bay Point to succeed in a claim of breach of contract against InterBank, Bay Point must show: (i) a valid contract exists; (ii) Bay Point performed or tendered performance as contractually required; (iii) InterBank breached the contract by failing to perform or tender performance as contractually required; and (iv) Bay Point sustained damages due to the

---

[13] Previously, Count I in the Original and First Amended Complaints.

breach. *See Coim USA Inc. v. Sjobrand Inc.*, 663 F. Supp. 3d 684, 687–88 (N.D. Tex. 2023) (citing

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019)).

160.    Here, Bay Point and InterBank entered into the ICA, a valid contract premised on

InterBank's non-truths (*e.g.*, InterBank misrepresentation that it had a valid first lien). Bay Point

funded the loan to Debtor and performed its obligations under the ICA. InterBank breached the

ICA at signing and continued to breach the ICA when InterBank (i) failed to provide Bay Point

with Debtor's complete and accurate financials; (ii) knew Debtor's construction was significantly

over budget; (iii) failed to require Debtor to maintain all its bank accounts at InterBank; (iv) failed

to properly administer the required retainage account; (v) advances to Debtor for construction

without Debtor's event of default; (vi) knew work stoppages over 21 consecutive days or 45 days

in the aggregate; (vii) funded the final construction advance without standard checklist items; (viii)

failed to provide an accounting to Bay Point for the use of proceeds from eminent domain; and

(ix) knew of multiple material adverse events. Because of InterBank's breach of the ICA, Bay

Point sustained a minimum of damages of $4 million.

161.    Accordingly, InterBank breached the ICA, and Bay Point should be allowed to

recover damages.

### D. Negligent Misrepresentation (Count IV)[14]

162.    Bay Point re-alleges and incorporates paragraphs 1 through 161 above in support

of Count IV.

163.    InterBank negligently misrepresented the value and health of the Debtor to Bay

Point.

164.    Under Texas law, a claim for negligent misrepresentation consists of the following

---

[14] Previously, Count IV in the Original and First Amended Complaints.

elements: (1) the defendant made a representation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *McKinney/Pearl Rest. Partners, LP v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 768 (N.D. Tex. 2017) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

165.    Here, InterBank received an appraisal of the Debtor from CBRE on January 21, 2022. The CBRE Appraisal was reviewed by an independent third party who was paid an appraisal review fee. CBRE indicated the value of the RV Park was $11,600,000.. InterBank's original loan term sheet to the Debtor was for $8 million. Based on the appraisal and InterBank's 60% LTV requirement, InterBank's loan to Debtor was $7 million. InterBank funded their loan on July 18, 2022. On November 1, 2022, InterBank has some serious problems with the loan and loan documentation. The Debtor was behind schedule with multiple-months delays in construction and were at least $5 million over budget. InterBank's potential to recoup its financing looked bleak. On March 16, 2023, InterBank had JLL appraise the Debtor. JLL appraised the Debtor at $30,800,000. But JLL's appraisal was requested by and went straight to the president of InterBank—not the bank's Appraisal Manager that requests appraisals for the bank. JLL's appraisal was also not reviewed by a third party, like CBRE's Appraisal.

166.    Additionally, InterBank made many material misrepresentations in the ICA about the Debtor's finances and the Project—including, *inter alia*, how well the Debtor was staying on budget without any significant construction delays.

55

167.    InterBank also represented and warranted that no Material Adverse Event had occurred—even though multiple Material Adverse Events occurred.

168.    InterBank made these material false statements or omissions to Bay Point so Bay Point would loan the Debtor money to finish the Project. And InterBank failed to do any diligence to confirm their statements' efficacy.

169.    Based on InterBank's representations and warranties, Bay Point loaned the Debtor the Bay Point Loan and suffered the pecuniary loss of $4 million.

170.    Accordingly, InterBank negligently misrepresented the Debtor's conduct within their loan and lured Bay Point into, unbeknownst to Bay Point, bailing InterBank, and Bay Point should be allowed to recover damages.

**E.  Fraudulent Inducement (Count V)[15]**

171.    Bay Point re-alleges and incorporates paragraphs 1 through 170 above in support of Count V.

172.    InterBank fraudulently induced Bay Point to loan the Debtor $4,020,000.

173.    A fraudulent inducement claim arises when a party is induced to enter into an agreement through fraud or misrepresentation. *In re Carroll*, 464 B.R. 293, 316 (Bankr. N.D. Tex. 2011). A claim for fraudulent inducement shares the same elements as a simple fraud claim, which are: (1) that a material misrepresentation was made that was false; (2) that was either known to be false when made or was asserted without knowledge of its truth; (3) that was intended to be acted on; (4) that was relied on; and (5) that caused injury. *Id.*

174.    Here, InterBank made many material misrepresentations. With JLL, it misrepresented the value of the Project. With JLL, it grossly misrepresented the Debtor's future

---

[15] Previously, Count V in the Original and First Amended Complaints.

potential. It materially misrepresented to Bay Point the Debtor's financial strength and know-how, accounting abilities, construction delays in the Project, use of the construction budget, and missing funds for construction. InterBank also materially misrepresented to Bay Point that the Debtor never had a Material Adverse Event when the Debtor had many Material Adverse Events. InterBank also misrepresented that it had complied with all "laws" and "regulations" applicable to it, which include those arising from its status as a FDIC member bank.   InterBank knew its misrepresentations were not true when it made them. But InterBank needed Bay Point to fund the rest of the Project to ensure InterBank's interest was secured. Therefore, InterBank expected Bay Point to rely on them. And Bay Point did rely on them when Bay Point loaned $4 million to the Debtor. Thus, Bay Point suffered the loss of at least $4 million.

### F.  Negligent Misrepresentation – Condemnation Proceeds (Count VI)[16]

175.    Bay Point re-alleges and incorporates paragraphs 1 through 174 above in support of Count VI.

176.    InterBank made negligent misrepresentations with respect to the Condemnation Proceeds Letter.

177.    Under Texas law, a claim for negligent misrepresentation consists of the following elements: (1) the defendant made a representation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *McKinney/Pearl Rest. Partners, LP v. Metro. Life Ins. Co.*, 241 F.

---

[16] Previously, Count IV in the Original and First Amended Complaints.

Supp. 3d 737, 768 (N.D. Tex. 2017) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

178.   Here, InterBank in the course of its business represented to Bay Point through the Letter that: (i) there were valid liens or amounts due to subcontractors to be paid and (ii) that none of the condemnation proceeds would be paid to Debtor and by extension its affiliates. That information was false. Under InterBank's watch and direction, funds went directly to Debtor and indirectly to Debtor through the purported payment of false liens. Such payment was against lien releases, and InterBank issued to Price Drop without doing any diligence whatsoever to confirm any information about that entity.

179.   Bay Point had a lien against the condemnation proceeds, and the various loan documents and ICA specifically outlined how such proceeds were to be handled. In reliance on the Condemnation Proceeds Letter and the false representations made in it, Bay Point consented to InterBank having sole and exclusive control over the condemnation proceeds.

180.   At best, InterBank was negligent in the representations it made in the Condemnation Proceeds Letter and the subsequent handling of the condemnation proceeds. Given that payments were directly made to Debtor at InterBank's direction, InterBank made knowingly false representations in the Condemnation Proceeds Letter, to the detriment of Bay Point, which had a lien against the condemnation proceeds.

181.   Bay Point was damaged by the negligent misrepresentations made by InterBank. Under no circumstances at the time of the Condemnation Proceeds Letter, Debtor would not have received any of the condemnation proceeds, let alone a direct payment of nearly $200,000 and an indirect payment of nearly $600,000, all of which could have been used to shore up Debtor's

58

finances or reduce the outstanding balance due to InterBank or Bay Point, improving the position of all creditors beyond InterBank.

## G. Equitable Subordination of Security Interest (Count VII)

181. Bay Point re-alleges and incorporates paragraphs 1 through 180 above in support of Count VII.

182. InterBank acted outrageously when it fraudulently induced Bay Point and unsecured creditors to continue to fund the Debtor when InterBank knew that it was undersecured but if others kept funding the Debtor then InterBank's securitization would increase.

183. "The bankruptcy court has long been recognized as a court of equity." S*ee Matter of Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991). "Its equitable powers allow a bankruptcy court to produce fair and just results 'to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *Id.* (citation omitted). "The judicially-created doctrine of equitable subordination developed as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt." *Id.* This doctrine is now codified at 11 U.S.C. § 510(c), which provides that:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

59

*Id.*

184.     Courts apply a three-prong test for equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Id.* at 1464–65. Typically, for a non-insider creditor to have its claim subordinated, there must be a showing of "fraud, spoliation, or overreaching." *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991).

185.     Here, InterBank engaged in lots of inequitable conduct. InterBank gave a loan to the Debtor for the Project and then covered up that Roland had handled the loan and closing in violation of InterBank's policies (and was fired for it). The Debtor mishandled the funds—money went missing, the Project faced severe delays, and the Project went way overbudget. To complete the Project, the Debtor needed an additional $4 million. InterBank recently received the CBRE Appraisal for the Project and eventual RV Park. From that appraisal, InterBank knew it was severely under secured without the Project complete. On the other hand, if InterBank loaned more money to the Debtor, InterBank knew it would be even more under secured because the appraised value was at most $11.6 million.

186.     At that moment, InterBank had an existential choice to make—should it take its losses, come up with a novel way out of this pickle, or commit fraud to lure another sucker to invest this Project. InterBank chose option #3.

187.     Instead of foreclosing and taking its losses at that moment, InterBank conspired with JLL and Bill Moist (an insider, related to Dry Built, and a former appraiser) to have JLL make

60

a new appraisal only a year after the CBRE Appraisal. JLL "valued" the Debtor at almost $31 million or almost 300% of the value of the CBRE Appraisal.

188. Unlike the CBRE Appraisal, the JLL Appraisal lacked third-party review. Also, unlike the CBRE Appraisal, the JLL Appraisal was requested by and provided directly to the president of InterBank and otherwise significantly violated InterBank's appraisal policies.

189. To reward JLL for its help, JLL was the company chosen to market the Debtor's financing and take a fee. JLL marketed to Bay Point. Based on the JLL Appraisal, Bay Point was interested in the loan opportunity. Once JLL had Bay Point on the hook, InterBank reeled Bay Point in. InterBank agreed to the ICA, making material misrepresentations by the handful—about the Debtor's finances, accounting practices, and construction timeliness. InterBank also warranties that no Adverse Material Event took place when lots took place. InterBank knew all of these representations were false, but InterBank also knew that they did not want to risk being more under secured.

190. Based on InterBank's willful material misrepresentations, Bay Point loaned the Debtor about $4 million that InterBank knew Bay Point could never get back. This caused others to continue to invest in the Debtor that would have lost less money but for InterBank's outrageous conduct. This also caused the Debtor to take on more vendors that likely will show up with unsecured claims that would not have existed but for InterBank's outrageous conduct. Therefore, InterBank's misconduct resulted in injury to the creditors and conferred an unfair advantage on InterBank. And, here, equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. See *Fabricators*, 926 F.2d at 1464. InterBank committed fraud and should not be rewarded. Under § 510(c)(1), InterBank should be subordinated below Bay Point and the other injured parties. The class of creditors behind Bay Point is the unsecured creditors. InterBank

61

should join them. And under § 510(c)(2), InterBank's lien should be stripped.

### H. Breach of the August 23, 2024, Letter (Count VIII)

191.   Bay Point re-alleges and incorporates paragraphs 1 through 190 above in support of Count VIII.

192.   This Court previously dismissed Count VIII (previously, Count II) of the Complaint; accordingly, in this Amended Complaint, Bay Point does not assert the same but does reserve: (i) the right seek to amend this Complaint to assert Count VIII again should facts develop and (ii) all appellate rights with respect to the Order dismissing Count VIII.

### H. Conversion of Bay Point's DOT Proceeds (Count IX)

193.   Bay Point re-alleges and incorporates paragraphs 1 through 192 above in support of Count IX.

194.   This Court previously dismissed Count IX (previously, Count III) of the Complaint; accordingly, in this Amended Complaint, Bay Point does not assert the same but does reserve: (i) the right seek to amend this Complaint to assert Count IX again should facts develop and (ii) all appellate rights with respect to the Order dismissing Count IX.

### I. Fraud (Count X)

195.   Bay Point re-alleges and incorporates paragraphs 1 through 194 above in support of Count X.

196.   This Court previously dismissed Count X of the Complaint (previously, Count IV); accordingly, in this Amended Complaint, Bay Point does not assert the same but does reserve: (i) the right seek to amend this Complaint to assert Count IX again should facts develop and (ii) all appellate rights with respect to the Order dismissing Count IX.

## OBJECTION TO REH'S REQUESTED RELIEF FROM THE AUTOMATIC STAY

197.    Bay Point re-alleges and incorporates paragraphs 1 through 198 above in support of its Objection to REH's Amended Motion for Relief from the Automatic Stay (ECF No. 52).

198.    Bay Point files this Objection (the "Objection") to *REH's Amended Motion for Order Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (2), With Respect to Property Located at Lot 1, Block A, Ennis RV Resort & Storage* [Dkt. No. 52] ("Stay Relief Motion").

199.    The equitable subordination claim asserted in this Complaint serves as an affirmative defense to the Stay Relief Motion.  So does the assertion that REH does not hold a first priority lien (or any lien) in Debtor's Property, as is alleged in Count I.

200.    Bay Point's right to equitably subordinate the REH Secured Claim exists only under the Bankruptcy Code. If the automatic stay is terminated and REH is allowed to foreclose on the Property, Bay Point would be deprived of the defense of equitable subordination in the nonbankruptcy forum and deprived of a right available to it only in this pending bankruptcy case. Accordingly, Bay Point submits that equity would be better served to deny the Motion and permit the adjudication of claims asserted in the Adversary Proceeding.

201.    The facts and law in support of equitable subordination are rooted in fraud, fraudulent inducement, and Bay Point's additional claims in this Adversary Proceeding.

202.    In the words of the great poets Dwayne Michael Carter, Jr., Aubrey Drake Graham, and Onika Tanya Maraj-Petty, the creditors "don't need no frauds." Subordination would level the playing field based on InterBank's egregious conduct and leave equity in the estate for the unsecured creditors, maximizing the value of the Estate for all honest creditors.

**OBJECTION TO REH'S PROOF OF CLAIM**

203.　　Bay Point realleges and incorporates paragraphs 1 through 202 above in support of its Objection to REH's proof of claim.

204.　　On August 7, 2025, REH filed a proof of claim ("POC 4") asserting a claim of $7,277,807.19, which includes a secured portion in the amount of $5,500,000.

205.　　Section 502(a) of the Bankruptcy Court provides that a "claim or interest . . . is deemed allowed, unless a party in interest . . . objects."[17]

206.　　Bay Point is a secured creditor of the Debtor and is thus a party in interest in the Debtor's Bankruptcy Case pursuant to section 1109(b) of the Bankruptcy Code.[18] As a party in interest, Bay Point has standing to appear and be heard on any issue in the Debtor's Bankruptcy Case, including to object to the claims of other creditors.

207.　　Bay Point objects to POC 4 on the basis that REH does that hold a secured claim.

208.　　Bay Point incorporates the facts, statements, allegations and arguments set forth in paragraphs 113–155 in support of its objection to POC 4. As set forth in more detail in paragraphs 113–155 above, the Deed of Trust allegedly securing the secured claim asserted in POC 4 was not acknowledged by a notary public at the time Moist signed it on behalf of Debtor, or Moist signed the Deed of Trust outside the presence of the notary public that notarized the Deed of Trust, the Deed of Trust was (and is) unrecordable and void under Tex. Prop. Code §§ 12.001(b)(1) and 13.001(a). As such, REH does not hold a secured claim. Therefore, the secured claim asserted under POC 4 is invalid and must be disallowed as a secured claim under section 506(a) of the

---

[17] *See* 11 U.S.C. § 502(a).
[18] Section 1109(b) of the Bankruptcy Code provides: Section 502(a) also states that a "claim or interest . . . is deemed allowed, unless a party in interest . . . objects."
　　(b) a party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

Bankruptcy Code and the claim asserted in POC 4 must be reclassified as a general unsecured claim in its entirety.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Bay Point prays for the following relief:

a.      Bay Point is declared the first lienholder of the Debtor's Property under Texas law;

b.      InterBank's lien on Debtor's Property be void to all creditors and determined to be fraudulent under the Texas Fraudulent Lien Statute.

c.      InterBank's lien be stripped from the Debtor's Property;

d.      InterBank be equitably subordinated behind Bay Point to an unsecured creditor;

e.      InterBank be found liable for breach of the ICA, multiple negligent misrepresentations, and fraudulent inducement;

f.      Bay Point be awarded economic damages to recover for the above causes of action;

g.      Bay Point be awarded exemplary and punitive damages based on InterBank's egregious conduct;

h.      Bay Point be awarded reasonable and necessary attorneys' fees under Tex. Civ. Prac. & Rem. Code 38.001, 28 U.S.C. § 2202, and/or the terms of the ICA;

i.      Bay Point be awarded court costs and pre- and post-judgment interest; and

j.      All such other relief to which Bay Point may be justly entitled. Bay Point does not waive or release any claim that was previously dismissed by this Court but instead reserves all rights with respect to the dismissed claims.

Date: March 22, 2026

Respectfully submitted,

By: */s/ J. Blake Glatstein*
Jeff P. Prostok
State Bar No. 16352500
Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: (817) 214-4990
Fax: (817) 214-4988
jeff.prostok@vkhh.com
emily.chou@vkhh.com
blake.glatstein@vkhh.com

***COUNSEL FOR BAY POINT
CAPITAL PARTNERS II, LP***

## CERTIFICATE OF SERVICE

I certify that on March 22, 2026, a true and correct copy of the foregoing document was served electronically on all parties requesting electronic service through the Court's ECF system, and unredacted copy of the foregoing document was served via email on all parties entitled to such copy.

By: */s/ J. Blake Glatstein*
J. Blake Glatstein